**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PAULETTE THOMPSON,** | : | |
| **Plaintiff,** | : | **Case No. 2:09-CV-293** |
| **v.** | : | **Judge Holschuh** |
| **CHASE BANKCARD SERVICES, INC.,** | : | **Magistrate Judge Deavers** |
| | : | |
| **Defendant.** | : | |
| | : | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Paulette (Thompson) Rutledge, an African-American female, filed suit against her former employer, Chase Bankcard Services ("Chase"), alleging retaliatory discharge in violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* and Ohio Rev. Code § 4112, and race discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.* and Ohio Rev. Code § 4112. This matter is currently before the Court on Defendant's motion for summary judgment. (Doc. # 16.) For the following reasons, Defendant's motion is **GRANTED in part** and **DENIED in part**.

**I.     Background and Procedural History**

Plaintiff Paulette (Thompson) Rutledge began working for Bank One, Chase's predecessor,[1] on January 5, 1998 as a financial services advisor: a customer service position where she took incoming phone calls from credit card customers. (Thompson Dep. 164, 168, 196, doc. # 18.) Around April of 1999, Plaintiff was hired as an advisor in the new "dispute by phone" department

---

[1]Bank One and Chase merged in July 2004. (Thompson Dep. 164.)

where she handled calls from credit card customers who were disputing charges or complaining of billing errors. (Id. 202-05, 209-10.)  In August of 2004, Plaintiff was promoted to senior chargeback advisor, a position where she continued to take regular customer calls, began taking "escalated" calls where the customer asked to speak to a supervisor, and also answered chargeback advisors' questions when those advisors were seeking guidance. (Id. 220-24; Weatherwax Dep. 11, 35-37, doc. # 19.)  In her "dispute by phone" department, Plaintiff reported to a "Team Manager," and that manager's supervisor, the "Team Leader." (Thompson Dep. 174-75, 212; Weatherwax Dep. 8.) Plaintiff performed well in her position as a senior advisor and "met expectations" in her annual review in August 2005. (Thompson Dep. 220; Ex. 21, doc. # 18-4.)

In November 2005, Plaintiff's godmother, who was an important part of her life after her mother passed away, died of congestive heart failure. (Thompson Dep. 158.)  Plaintiff's Team Leader at that time, Kathy Kaskocsak, allowed Plaintiff to take bereavement leave even though her godmother was not a blood relative. (Id. 230-31.)  In February 2006, Plaintiff suffered another major loss when her younger brother passed away. (Id. 158-59.)  These deaths profoundly affected Plaintiff and Chase recommended that she take a leave of absence and contact the Employee Assistance Program ("EAP") for counseling. (Id. 156-57, 231, 236.)  Plaintiff did so and went on short-term disability leave from March 3 through April 20, 2006, during which time she received professional mental health counseling through an EAP referral, and worked through her struggle with depression. (Id. 156-58, 228-33; Ex. 24, doc. # 18-4.)

During this same time period, over 2005 and 2006, Plaintiff was also experiencing heart palpitations, trembling hands, and an inability to focus. (Thompson Dep. 133-34.)  Her family physician suspected that she had an overactive thyroid some time in 2005 and referred her to a

2

specialist when her symptoms did not improve in 2006. (Id. 233, 237.) When Plaintiff's doctor asked about what kind of stress she might she might be under, in an attempt to uncover the cause of her heart palpitations, Plaintiff told him about the stress of her job as a senior chargeback advisor, taking back-to-back escalated calls. (Id. 233-34.) Plaintiff's doctor thereafter suggested that she work in a less stressful position. (Id. 237.) She discussed this issue with her counselor who noted that although Plaintiff was ready to return to work in April 2006, she was concerned about returning to the same stressful position. (Id. 233-34; Ex. 24, doc. # 18-4.) From the record, it appears that Plaintiff was concerned about the stress of her job due in part to her doctor's concerns, and also in part to her struggle with depression and anxiety following the deaths of these two close family members. (Exs. G, H to DiRenna Dep., docs. ## 20-2, 20-3; Thompson Dep. 237.)

Before Plaintiff returned to work in April 2006, she contacted Andrea Clark, her Human Resources ("HR") Business Partner, to find out if she could transfer to a less stressful position, without direct customer interactions. (Id. 237.) Clark informed Plaintiff that there were no positions in Card Services that did not involve customer contact except for janitorial work. (Id. 237-38.) Consequently, Plaintiff returned to work as planned, in her position as a senior chargeback advisor, but began applying for other positions internally at Chase. According to Plaintiff, there were research and investigation positions which did not require customer contact. (Id. 236-40.) Plaintiff was not interviewed for these positions, and despite this search for a less stressful job, she continued to perform well as a senior chargeback advisor, again "meeting expectations" in her annual review in August 2006 and receiving a nomination for Employee of the Month in November 2006. (Id. 240, 225-26, 258-60; Exs. 23, 28, doc. # 18-4.) However, Plaintiff's August 2006 review did note that she was working on "using more courteous phrases," and showing "more empathy" to card

members. (Ex. 23, doc. # 18-4.)

After returning to work from her short-term leave, Plaintiff was formally diagnosed with Graves' disease in July 2006. (Thompson Dep. 236.)  Graves' is an autoimmune disease that affects the thyroid gland and according to Plaintiff, causes her mind to race, her heart to palpitate, and her eyes to twitch when symptoms flare up. (Id. 132-35, 137, 144.)  Plaintiff applied and was approved for her first period of intermittent FMLA leave from July 20, 2006 through January 20, 2007. (Id. 184-85.)  Plaintiff requested this leave so that she could attend medical appointments related to her Graves' disease. (Id.)  Plaintiff understood that FMLA leave was to be used to cover appointments with healthcare professionals and not used for personal errands or other business. (Id. 186-87.)  Plaintiff was to inform her immediate supervisor, the Team Manager, either by calling in or sending an email, whenever she was taking an absence covered by her FMLA leave. (Id. 180, 185-86.)  Plaintiff began taking medication for her condition in 2006 and has reported that her Graves' disease is controlled through medication. (Id. 135.)

Around December 2006 or January 2007, Plaintiff began reporting to a new Team Manager, Dawn Weatherwax. (Id. 261.)  Plaintiff had a good relationship with Weatherwax, who met with Plaintiff monthly to review the quality of a random sampling of her calls with customers. (Id. 264-67.)  Plaintiff was rated on a scale of 1 to 5, with 5 being the best, and was required to maintain a quality rating of 3 or else face progressive counseling or other disciplinary action. (Id. 265.)  On June 6, 2007, Weatherwax met with Plaintiff to discuss her unacceptable quality scores for the months of March and April, and also to discuss her tardiness on four occasions. (Id. 266, 271; Exs. 29, 30, doc. # 18-4.)  In both March and April 2007, Plaintiff received a 1 out of 5. (Ex. 30, doc. # 18-4.)  Plaintiff was counseled on specific calls and on the importance of paying attention to detail,

being empathetic, and building rapport with card members. (Id.; Weatherwax Dep. 46-47.) Plaintiff was aware that she had to maintain a minimum quality rating of 3 going forward, or else face disciplinary action such as receiving a written warning. (Ex. 30, doc. # 18-4.)  Plaintiff did improve the quality of her calls thereafter. (Weatherwax Dep. 27, 33.)

In June 2007, after a year of testing and unexplained pain and illness, Plaintiff's son was formally diagnosed with Crohn's disease. (Thompson Dep. 147-48.)  Crohn's disease causes inflammation of the digestive tract and results in severe abdominal pain and complications with digestion. (Id. 147-49, 175.)  Her son's illness sometimes caused Plaintiff to be late for work and in fact, after she was counseled on her tardiness on June 6, 2007, Plaintiff informed Team Leader Kaskocsak that her "tardies" were due to her son's illness. (Id. 175, 181; Ex. 29, doc. # 18-4; Kaskocsak Dep. 18-19.) Kaskocsak was sympathetic, as her husband also has Crohn's disease, and informed Plaintiff that she could apply for FMLA leave to cover absences due to her son's illness. (Thompson Dep. 176-78; Kaskocsak Dep. 18, 20-21.)  Plaintiff took this advice and was approved for intermittent FMLA leave to care for her son from June 28 through December 28, 2007. (Thompson Dep. 179-80.)  Plaintiff followed the reporting protocol for use of FMLA leave by notifying Weatherwax, via phone or email, when she would be absent due to her use of FMLA time. (Id. 185-86.)  Weatherwax knew that Plaintiff had begun using FMLA time to care for her son. (Weatherwax Dep. 62.)

In July 2007, Plaintiff applied for a second period of intermittent FMLA leave to cover her own illness from July 22, 2007 through January 22, 2008. (Thompson Dep. 273-74; Ex. 31, doc. # 18-5.)  Before she received approval of this request from Chase's Disability Management Services ("DMS") office located in Chicago, Illinois, Plaintiff attempted to use her FMLA time

inappropriately on July 20th to cover an absence when she was sent home from work for a dress code violation. (Thompson Dep. 274-75, 278-79; Ex. 31, doc. # 18-5.)  On July 25, 2007, Weatherwax met with Plaintiff to discuss the appropriate use of FMLA time and the Bank's dress code policy, due to this incident on July 20th, and also to discuss three occasions when Plaintiff transferred customer calls into other managers' voicemails. (Ex. 33, doc. # 18-5.)  In that regard, Weatherwax discussed the email which Plaintiff received in June 2007, which instructed advisors not to "dump" calls in another manager's voicemail, but instead get the customer to a live person unless the customer insisted on being sent to voicemail. (Exs. 33, 34, doc. # 18-5.)  Weatherwax informed Plaintiff that she should be escalating calls to her if necessary. (Ex. 33, doc. # 18-5.)

Despite these issues, Plaintiff "met expectations" in her August 2007 annual review, although the review noted her recent struggle with the quality of her calls and her need to improve in developing rapport and "enforcing company policies without creating negative reactions." (Ex. 36, doc. # 18-5.)  Plaintiff received the letter from DMS approving her second period of intermittent FMLA leave to cover her Graves' disease on August 1, 2007 at her home. (Ex. 31, doc. # 18-5; Thompson Dep. 273.)  Plaintiff followed the reporting protocol and left messages for or emailed Weatherwax when she was taking FMLA leave to cover absences related to her own illness. (Thompson Dep. 185-86.)  On August 31, 2007, Plaintiff was fired for providing unacceptable customer service on an escalated call that she received on August 29, 2007. (Trans. of Phone Call, Ex. 37, doc. # 18-5; Recommendation for Termination, Ex. 40, doc. # 18-5; Recording of Phone Call, Ex. 47, filed manually.)

On August 29, 2007, after Plaintiff's monthly quality review had already been completed, (Thompson Dep. 355-56, 363-64), Plaintiff received an escalated call from dispute by phone advisor

6

Toby Bushong. (Id. 305-06; Ex. 37, doc. # 18-5; Ex. 47, filed manually.)  Bushong informed her that the customer was disputing a charge from a particular merchant and that the customer had already been referred to the Quality Customer Care unit ("QCC"), which already notified the him three times that Chase was unable to assist him. (Thompson Dep. 304, 306, 310, 333; Exs. 37, 47.)  Plaintiff told Bushong, "Yeah, um, he ain't getting nothing, you can go ahead and send 'em on . . . ." (Exs. 37, 47.)  When Plaintiff spoke to the customer, he was extremely upset that the Bank had sided with the merchant, rather than him, in this dispute. (Id.; Thompson Dep. 312.)  Plaintiff spoke over the customer at times as she attempted to explain that QCC had sent him another letter informing him that the Bank was unable to refund his money or do anything further to assist him. (Exs. 37, 47; Thompson Dep. 311.)  The customer began talking about taking his business elsewhere and said, "Every month I spend two thousand dollars. You look at my card? Two thousand dollars every month. Would you like me to go somewhere else?" (Exs. 37, 47; Thompson Dep. 309.)  Plaintiff did not answer his question but responded, "Is there anything I can help you with?" (Id.)  The customer again asked if he should take his business elsewhere. This time Plaintiff responded, "That's your choice." (Id.)  Plaintiff admits that this is an inappropriate response to a credit card customer threatening to take his business elsewhere. (Thompson Dep. 313-15.)   After Plaintiff told the customer that it was his choice to go elsewhere, he continued to speak and asked Plaintiff what she was going to do about his situation.  When she didn't respond, he asked again, and then continued to say "Hello?" and "Are you still on the line?" for at least 30 seconds without a response until he finally hung up. (Exs. 37, 47.)[2]  Plaintiff did not report a headset malfunction or system error during

---

[2]There is a discrepancy regarding how long the customer stayed on the line asking Plaintiff questions between the recording of the phone call (ex. 47, filed manually) and the transcript of the call (ex. 37, doc. # 18-5).  The transcript shows that the customer remained on

or after that call and in fact, took twelve more calls before her shift ended that day. (Thompson Dep. 318-25; Exs. 38, 39, doc. # 18-5.)

When Bushong initially transferred the call, he remained on the line, listening in, and notified his manager of the situation. (Thompson Dep. 333, 354-56; Weatherwax Dep. 42.)  Bushong's supervisor, another team manager in the Department, listened to the call and notified Weatherwax that she needed to listen to Plaintiff's call with this customer. (Weatherwax Dep. 42.)  He followed up with her the next day about it. (Id.)  Weatherwax informed him that she had listened to the call, and that she thought that Kaskocsak needed to listen to it as well.  (Id. 43.)  After Weatherwax and Kaskocsak listened to the call together, they decided that they needed to bring it to Clark, the HR Business Partner. (Id.)  The decision to terminate an employee is a group discussion between the team manager, team leader, and HR business partner; in this case, after listening to Plaintiff's interaction with the customer and her failure to respond at the end of the call, Weatherwax, Kaskocsak, and Clark determined that Plaintiff's non-response was intentional and warranted her immediate termination. (Id. 43-46, 48; Kaskocsak Dep. 33-34, 40, 42.)

At her termination meeting on August 31, 2007, which was conducted by Weatherwax and Kathleen DiRenna, who stood in for Clark since she was absent that day, Plaintiff was asked if she remembered having any headset problems because she had received an escalated call from an advisor but had refused to respond to the customer. (Thompson Dep. 300.)  Plaintiff only generally responded that she sometimes had trouble with her headset. (Id. 300-01.)  Plaintiff then asked if she could listen to the call and was told that she could not, and also that Weatherwax and Kaskocsak had

the line, asking questions without response for over a minute.  The actual recording filed with this Court, however, records the customer on the line for approximately thirty seconds asking questions without response before the recording ends.

8

already listened to the call and made up their mind, so playing the call again would not have changed the outcome. (Id. 301; DiRenna Dep. 22-24.)  During her deposition, DiRenna explained that the room that they were in for the termination meeting did not have the technology to play the call and that the decision was final in any event, so having Plaintiff listen to the call would have been futile. (DiRenna Dep. 23-24.)  Therefore, at that meeting, Plaintiff was terminated for "refusing to assist a customer." (Recommendation for Termination, Ex. 40, doc. # 18-5.)  Her termination record explained that Plaintiff had inappropriately responded to the customer, telling him that it was "his choice" to take his business elsewhere and that after making this statement, Plaintiff never responded to the customer again, even though the customer remained on the line for another minute and thirty seconds, continuing to speak and asking Plaintiff if she was still on the line before hanging up. (Id.) Plaintiff's termination record also noted that she had "previously been counseled on the Quality of her calls and taking ownership of accounts with respect to resolving issues and not transferring them to a supervisor . . . this counseling included building rapport on calls and using appropriate tone with cardmembers." (Id.)  At the time that she was fired, Plaintiff's Graves' disease was in remission. (Thompson Dep. 143.)

After she was terminated, Plaintiff applied for and received unemployment compensation.[3]

---

[3]Chase appealed Plaintiff's receipt of unemployment compensation, and the February 4, 2008 hearing, the Hearing Officer ruled in favor of Chase, finding that Plaintiff was terminated for "just cause." Under Ohio law, an individual is not eligible for unemployment benefits if she was discharged for "just cause" in connection with her work. Ohio Rev. Code § 4141.29(D)(2); Cooper v. City of North Olmstead, 795 F.2d 1265, 168 (6th Cir. 1986). The "just cause" determination "focuses on the existence of fault on the part of the employee as a factor in the discharge."Cooper, 795 F.2d at 1268.  Plaintiff appealed to the Franklin County Court of Common Pleas and on August 26, 2008, the court issued a decision in her favor, overturning the decision below, and finding that Plaintiff was not fired for "just cause." (State Ct. Judgment, Ex. 3, doc. # 23-3.)  Although Plaintiff mentions these facts in the introduction of her memorandum in opposition, she does not cite these facts to support the legal arguments made in her

(Pl.'s Mem. in Opp'n 6.)  On January 25, 2008, Plaintiff filed a charge of race and disability discrimination with the Ohio Civil Rights Commission ("OCRC").  OCRC investigated and found no probable cause to believe that Chase had discriminated against Plaintiff. (Thompson Dep. 335.) That finding was upheld on appeal and also later adopted by the Equal Employment Opportunity Commission ("EEOC") on May 13, 2009. (Id. 335-36; Ex. 42, doc. # 18-5.)  In the meantime, Plaintiff had already filed suit against Chase in the Franklin County Court of Common Pleas on February 27, 2009, alleging retaliation in violation of the FMLA and race and disability discrimination in violation of the ADA, Title VII, and Ohio law.  On April 16, 2009, Chase removed this action to federal court alleging federal question jurisdiction over the FMLA, ADA, and Title VII claims and pendent jurisdiction over the related state law claims for discrimination. (Doc. # 2.) Chase now moves for summary judgment on all of Plaintiff's claims. (Doc. # 16.)

## II.    Standard of Review

Although summary judgment should be cautiously invoked, it is an integral part of the Federal Rules, which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  The standard for summary judgment is found in Federal Rule of Civil Procedure 56(c):

> [Summary judgment] . . . should be rendered if the pleadings, the

_____

memorandum in opposition.  The Court has reviewed the state court judgment and finds that it has no relevance or bearing on the present motion for summary judgment.  The state court's decision was based upon an incomplete record before the Hearing Officer, which, among other things, did not include a transcript or recording of the phone call in question, and also involved some procedural unfairness.  The Court addressed whether there was sufficient "just cause" to bar unemployment compensation under Ohio law. The issues presently before this Court, whether Chase unlawfully discriminated or retaliated against Plaintiff, were never raised in the state court proceeding. (State Ct. Judgment, Ex. 3, doc. # 23-3.) In any event, Plaintiff does not cite this ruling in support of any of the elements of her claims for relief.

> discovery and disclosure materials on file, and any affidavits show
> that there is no genuine issue as to any material fact and that the
> movant is entitled to judgment as a matter of law.

Summary judgment will be granted "only where the moving party is entitled to judgment as a matter

of law, where it is quite clear what the truth is . . . [and where] no genuine issue remains for trial,

. . . [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really

have issues to try." Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467 (1962) (quoting Sartor

v. Arkansas Natural Gas Corp., 321 U.S. 620, 627 (1944)).  See also Lansing Dairy, Inc. v. Espy,

39 F.3d 1339, 1347 (6th Cir. 1994).

Moreover, the purpose of the procedure is not to resolve factual issues, but to determine if

there are genuine issues of fact to be tried.  Lashlee v. Sumner,  570 F.2d 107, 111 (6th Cir. 1978).

The court's duty is to determine only whether sufficient evidence has been presented to make the

issue of fact a proper question for the jury; it does not weigh the evidence, judge the credibility of

witnesses, or determine the truth of the matter.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249

(1986); Weaver v. Shadoan, 340 F.3d 398, 405 (6th Cir. 2003).

In a motion for summary judgment, the moving party bears the initial burden of showing that

no genuine issue as to any material fact exists and that it is entitled to a judgment as a matter of law.

Leary v. Daeschner, 349 F.3d 888, 897 (6th Cir. 2003).  All the evidence and facts, as well as

inferences to be drawn from the underlying facts, must be considered in the light most favorable to

the party opposing the motion.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

587-88 (1986);  Wade v. Knoxville Util. Bd., 259 F.3d 452, 460 (6th Cir. 2001).  Additionally, any

"unexplained gaps" in materials submitted by the moving party, if pertinent to material issues of

fact, justify denial of a motion for summary judgment.  Adickes v. S.H. Kress & Co., 398 U.S. 144,

157-60 (1970).

"[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson</u>, 477 U.S. at 247-48 (emphasis in original).  A "material" fact is one that "would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of [an] appropriate principle of law to the rights and obligations of the parties."  <u>Kendall v. Hoover Co.</u>, 751 F.2d 171, 174 (6th Cir. 1984).  <u>See also</u> <u>Anderson</u>, 477 U.S. at 248.  An issue of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson</u>, 477 U.S. at 248.  <u>See also</u> <u>Leary</u>, 349 F.3d at 897.

If the moving party meets its burden, and adequate time for discovery has been provided, summary judgment is appropriate if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial.  <u>Celotex</u>, 477 U.S. at 322.  The nonmoving party must demonstrate that "there is a genuine issue for trial," and  "cannot rest on her pleadings."  <u>Hall v. Tollett</u>, 128 F.3d 418, 422 (6th Cir. 1997).

> When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must -- by affidavits or as otherwise provided in this rule -- set out specific facts showing a genuine issue for trial.  If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

Fed. R. Civ. P. 56(e).

The existence of a mere scintilla of evidence in support of the opposing party's position is

insufficient; there must be evidence on which the jury could reasonably find for the opposing party. <u>Anderson</u>, 477 U.S. at 252. The nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." <u>Moore v. Phillip Morris Companies, Inc.</u>, 8 F.3d 335, 340 (6th Cir. 1993). The court may, however, enter summary judgment if it concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the presented evidence. <u>Anderson</u>, 477 U.S. at 251-52; <u>Lansing Dairy, Inc.</u>, 39 F.3d at 1347.

## III.    Analysis

In her Complaint, Plaintiff alleges that she was unlawfully terminated by Chase in retaliation for her use of FMLA time to take care of her own serious health condition, Graves' disease, and for her son's serious health condition, Crohn's disease. Plaintiff also alleges that this same conduct amounts to discrimination on the basis of disability in violation of the ADA and Ohio law.[4]

### A.    Retaliation for Taking FMLA Leave

Under the FMLA, ". . . an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition," or because the employee's own "serious health condition . . . makes the employee unable to perform the functions"

---

[4]Plaintiff's Complaint also alleged that she was discriminated against on the basis of race in violation of Title VII and Ohio law. However, In her memorandum in opposition to Defendant's motion for summary judgment, Plaintiff abandons this claim for race discrimination. (Pl.'s Mem. in Opp'n 1, doc. # 23) ("Based upon the evidence gathered in discovery, Plaintiff will not be pursuing Count III relative to the race discrimination cause of action."). Consequently, the Court finds that Defendant's motion for summary judgment is well taken with respect to this claim.

13

of her position. 29 U.S.C. § 2612(a)(1)(C), (D).  Furthermore, it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]," or ". . . to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by [the FMLA]." 29 U.S.C. § 2615(a)(1), (2).  "Interference" with an employee's rights includes retaliating against an employee for exercising FMLA rights or considering an employee's use of FMLA leave "as a negative factor in employment actions." 29 C.F.R. § 825.220(c); Arban v. West Publ'g Corp., 345 F.3d 390, 403 (6th Cir. 2003).

### 1.     Prima Facie Case

When an employee alleges that she has been retaliated against for exercising her rights under the FMLA, she must produce either direct or indirect evidence of retaliation.  In the absence of direct evidence, the Sixth Circuit employs the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) to evaluate the plaintiff's claim. Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 315 (6th Cir. 2001); Bryson v. Regis Corp., 498 F.3d 561, 570 (6th Cir. 2007).  In order to establish a prima facie claim for "retaliation" or "discrimination" under the FMLA, a plaintiff must show that: (1) she exercised a statutorily protected right; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. See, e.g., Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 707 (6th Cir. 2008).

Here, there is no question that Plaintiff's FMLA claim relies upon indirect evidence of retaliation as she concedes, and there is no evidence to the contrary, that she was never criticized or disciplined for taking FMLA leave and there was no mention of FMLA leave, her illness, or her son's illness during her termination meeting in August 2007. (Thompson Dep. 175, 181, 186, 328-

14

30, doc. # 18; Ex. 40, doc. # 18-5.)  Instead, Plaintiff relies only on the temporal proximity between her leave and her termination to establish retaliatory motive.  Thus, the <u>McDonnell Douglas</u> framework will properly apply if Plaintiff can establish her prima facie case.  And in that respect, there is no dispute that the first two elements have been met.  The parties agree that Plaintiff took authorized FMLA leave during 2006 and 2007, that she was approved for further leave on August 1, 2007, and that Plaintiff suffered an adverse employment action when she was fired on August 31, 2007.[5] (Def.'s Mot. Summ. J. 8, 14, doc. # 16.)  However, Chase disputes the final element, arguing that Plaintiff cannot establish the requisite causal connection between her use of FMLA leave and her termination on August 31, 2007. (<u>Id</u>.)

In support of this argument, Chase maintains that it liberally granted Plaintiff's requests for medical leave, allowing her to take FMLA leave on eleven occasions in 2006 and thirty-one occasions in 2007, never criticizing or disciplining her for doing so. (<u>Id</u>.; Thompson Dep. 179-81, 184-86, 273-74, 342-46; Ex. 44, doc. # 18-5.)  Thus, Chase maintains that there is no reasonable basis to conclude that Plaintiff was "abruptly fired on August 31, 2007 in retaliation for exercising her FMLA rights over the prior two-year period, especially given the undisputed evidence of her job

---

[5]Plaintiff also states, but does not seriously argue or further support the claim, that she suffered the "adverse action" of being "unfairly counseled about her tardiness and attendance relative to her FMLA leave time." (Pl.'s Mem. in Opp'n 9-10.)  As Defendant correctly points out, the record shows that Plaintiff was legitimately counseled on her documented tardiness on June 6, 2007. (Ex. 29, doc. # 18-4; Pl.'s Ex. C, doc. # 19-4.)  It was only after this counseling that she explained that her "tardies" were due to her son's illness and was advised by Kaskocsak that she could apply for FMLA leave to cover those tardies. (Kaskocsak Dep. 19-21, 25-27; Thompson Dep. 175, 177-80.)  Further, the only counseling Plaintiff received "relative to her FMLA leave time" was on July 25, 2007, after Plaintiff admittedly attempted to use that FMLA leave improperly to cover a dress code violation. (Thompson Dep. 278-79, 341; Exs. 32, 33, doc. # 18-5.)  Thus, Plaintiff's termination is the only relevant "adverse employment action" in this case.

misconduct." ((Def.'s Mot. Summ. J. 14) (citing Grubb v. YSK Corp., Case No. 2:08-cv-11, 2009 WL 3150344 at *8-9 (S.D. Ohio Sept. 30, 2009) (Watson, J.) (holding that plaintiff could not establish causal connection where employer granted all FMLA and non-FMLA leave requests and where plaintiff admitted to misconduct prior to firing)).  Chase argues that Plaintiff has failed to submit sufficient evidence 'to raise the inference that her protected activity was the likely reason' for her termination. (Id. 15) (quoting Zanders v. Nat'l R.R. Passenger Corp., 898 F.2d 1127, 1135 (6th Cir. 1990)).

Plaintiff responds that the temporal proximity between her last approved request for intermittent FMLA leave, approval which she received on August 1, 2007 from the disability management department, and her August 31, 2007 termination, creates and strengthens the inference of retaliatory motive. (Pl.'s Mem. in Opp'n 9, doc. # 23) (citing Boggs v. Conrad, No. 98 CA 120, 1999 WL 783952, *2 (Ohio Ct. App. Sept. 27, 1999)).  Plaintiff also cites her increased and "substantial" use of FMLA leave in the first eight months of 2007, as compared to her FMLA leave in 2006, as an additional basis for Chase's "retaliatory action." (Id.)

Chase replies that Plaintiff's discharge thirty days after she received approval for her second request for FMLA leave related to her Graves' disease does not establish the necessary causal connection between her termination and use of FMLA time. (Def.'s Reply 3, doc. # 24.)  Chase maintains that the decision to approve Plaintiff's FMLA leave was made, and communicated to Plaintiff, by the Bank's Disability Management Services office ("DMS") located in Chicago, Illinois. (Id.) (citing Thompson Dep. 273; Ex. 31, doc. # 18-5; DiRenna Dep. 13-14, 18.)  In contrast, the decision to terminate her was made by Team Manager Dawn Weatherwax, Team Leader Kathy Kaskocsak, and the Human Resources Business Partner Andrea Clark, who were all located in

16

Columbus, Ohio. (Id.) (citing Kaskocsak Dep. 33; Weatherwax Dep. 42-43, 45.)  Chase further

explains that although Plaintiff's initial request for FMLA leave should have been made to her

manager, Dawn Weatherwax, who would have entered Plaintiff's request into the Bank's system,

Weatherwax would have had no further involvement in submitting or approving Plaintiff's

application for leave because once the initial request is made, DMS sends all necessary information

directly to the employee and all leave issues, including approval thereof, are handled by DMS

through direct communication with  the employee.[6] (Id. 3 n.3) (citing Kaskocsak Dep. 21-22;

DiRenna Dep. 13,-14, 18); (see Thompson Dep. 273.)  Thus, Chase argues that Plaintiff has not

shown that there is any causal connection between the two events because she has not presented any

evidence that the women responsible for the decision to terminate her had any knowledge that her

most recent FMLA request had been approved thirty days prior. (Id. 3.)  Chase asserts that federal

courts have found that unless the decision-makers have knowledge of a plaintiff's protected activity

prior to taking the adverse employment action, the temporal proximity between the two events is not

meaningful. (Id. 3-4) (citing Carpenter v. Permanente, Case No. 1:04-cv-1689, 2006 WL 2794787

at *18-19 (N.D. Ohio Sept. 27, 2006) (timing of plaintiff's discharge was merely coincidental where

no evidence was presented to show that decision-makers were involved in FMLA process or had any

knowledge of plaintiff's FMLA protected activity); Moss v. Lear, Case No. 2:05-cv-238PPS, 2007

_____

[6]Team Manager Dawn Weatherwax did not testify about entering any FMLA requests
into the system for Plaintiff, however, Team Leader Kathy Kaskocsak explained that employees
direct their intial request for FMLA leave to their manager, who would enter it into the computer
system, and thereafter, all communication would come from DMS to the employee. (Kaskocsak
Dep. 21-22.) Dawn Weatherwax was Plaintiff's manager when Plaintiff made her second request
for intermittent FMLA leave for her own illness. (Weatherwax Dep. 16; Thompson Dep. 261;
Kaskocsak Dep. 21.)  Weatherwax contended that Plaintiff never brought any FMLA
applications to her and Weatherwax further testified that she did not remember ever
communicating with DMS. (Weatherwax Dep. 31-32.)

WL 2901139 at *8 (N.D. Ind. Sept. 28, 2007) (stating that FMLA retaliation claims have an inherent requirement that the decision maker have actual knowledge of the protected activity) (citing Luckie v. Ameritech Corp., 389 F.3d 708, 715 (7th Cir. 2004) (employer cannot penalize employee if employer is unaware of protected activity)).

The Court agrees with Plaintiff and finds that under the circumstances, the temporal proximity between Plaintiff's most recent request for further FMLA leave and her termination sufficiently raises an inference of retaliation. The Sixth Circuit has explained that "[a] plaintiff's burden in establishing a prima facie case is not intended to be an onerous one." Skrjanc, 272 F.3d at 315; Bryson, 498 F.3d at 571.  The burden of proof at this stage is minimal. Bryson, 498 F.3d at 571 (citing Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir.2007)).  Furthermore, the Sixth Circuit has held that proximity in time between a plaintiff's protected activity and the adverse employment action may be sufficient to establish a causal connection. Id.; Skrjanc, 272 F.3d at 314; Chandler v. Specialty Tires of America, Inc., 283 F.3d 818, 826 (6th Cir. 2002).

Despite Chase's argument that there is no evidence that the decision-makers had knowledge of Plaintiff's protected activity, the record shows that at least one decision-maker did have such knowledge.  As an initial matter, Plaintiff's protected activity is not only her use of FMLA leave, but also her requests for that leave; whether her supervisors knew that her most recent request had been approved is not dispositive of the question before the Court.   And with respect to Plaintiff's request, or application, for  FMLA leave, Kaskocsak has testified that an initial request for FMLA leave is made to an employee's manager, who then enters the request into the Bank's system.  Even though the application packet is then mailed directly to the employee from Chase's DMS office in Chicago, and all decisions to grant or deny leave are made by DMS and communicated directly to

18

the employee, a manager must make the initial request for the employee to get the application process started. (Kaskocsak Dep. 21-22.)

Here, Weatherwax was Plaintiff's manager when Plaintiff made her first request for FMLA leave on behalf of her son in June 2007, and her second request for FMLA leave on behalf of herself in July 2007. (Thompson Dep. 179-80, 261, 273-74.)  Plaintiff notified Weatherwax in advance via email, or called in and left her a message, every time she needed to use FMLA time to cover an absence. (Id. 180, 185-86.)  Weatherwax knew that Plaintiff was using FMLA leave to care for her son beginning some time after June 5, 2007. (Weatherwax Dep. 61-62.)  Plaintiff emailed Weatherwax on July 20, 2007, and attempted to use her FMLA time improperly to cover an absence caused by a dress code violation. (Id. 274-78; Ex. 32, doc. # 18-5.)  Thus, viewing the facts in a light most favorable to Plaintiff, at the time that Plaintiff was discharged, Weatherwax knew of the "substantial" FMLA time Plaintiff was taking in 2007, as Plaintiff reported these absences directly to Weatherwax; knew that Plaintiff had requested and was using FMLA leave to care for her son beginning in June 2007; knew that Plaintiff had attempted to use FMLA leave improperly on July 20, 2007; and knew that Plaintiff was requesting further FMLA leave for her own illness around the same time that she attempted to use that leave improperly.  Therefore, whether Kaskocsak, Clark, or Weatherwax knew that Plaintiff's most recent request for further FMLA leave had been approved is immaterial in light of all the facts known to Weatherwax at the time of Plaintiff's discharge. Thus, there is sufficient circumstantial evidence to raise an inference of retaliation under these circumstances.

Furthermore, the inference drawn from the temporal proximity between Plaintiff's protected activity and her termination is not destroyed by the fact that Plaintiff admitted to some "misconduct"

19

during the call in question, while Chase liberally granted all of Plaintiff's FMLA requests during her employment. (Def.'s Mot. Summ. J. 14) (citing Grubb v. YSK Corp., Case No. 2:08-cv-11, 2009 WL 3150344 at *8 (S.D. Ohio Sept. 30, 2009)).  The case cited by Chase in support of this argument, Grubb v. YSK Corp., is distinguishable and inapplicable to the facts of the present case. In Grubb, the employee's wrongful conduct and the decision to terminate him both occurred before he ever requested FMLA leave. 2009 WL 3150344 at *8.  In that case, Grubb committed misconduct at work, which he later admitted to during his deposition, and YSK investigated the situation, ultimately deciding to fire him pending a meeting with Grubb. Id. at *8.  After this misconduct and investigation, Grubb requested and was granted all FMLA and non-FMLA leave time that he was seeking. Id.  YSK then met with Grubb, gave him a chance to explain his misconduct, but ultimately fired him as planned. Id.  Thus, the court found that the temporal proximity in this case was merely coincidental under these circumstances. Id.

Here, conversely, Plaintiff's alleged "misconduct" and the decision to terminate her occurred after she requested, and was granted, further FMLA leave.  In fact, Plaintiff was fired on August 31, 2007, roughly one month after requesting her third period of intermittent FMLA leave, and two days after providing poor customer service on one telephone call. (Recommendation for Termination, Ex. 40, doc. # 18-5.)  Plaintiff's termination record reflected that her discharge was being recommended because Plaintiff "refus[ed] to assist a customer."  (Id.)  The explanation section of her termination record also mentioned that Plaintiff had previously been counseled on the quality of her calls, although it did not specifically recount examples of quality-related problems or dates of counseling. (Id.)  Thirty days before she was fired, however, Plaintiff "met expectations" in her annual review, just as she had consistently done throughout her entire tenure with Chase and Chase's predecessor,

Bank One, beginning back in 1998. (See Exs. 17-18, doc. # 18-3; Exs. 19-23, doc. # 18-4; Ex. 36, doc. # 18-5; Def.'s Reply 1.)  She met expectations in August 2007 despite her slip in quality ratings in March and April 2007, which improved thereafter, and despite her counseling for transferring calls into managers' voicemails, which occurred on July 25, 2007, roughly one week before her annual review was completed. (Weatherwax Dep. 27, 33; Exs. 33, 36, doc. # 18-5.)  Additionally, Plaintiff had been nominated for employee of the month in November 2006, less than one year before she was fired. (Ex. 28, doc. # 18-4.)  Thus, the record reflects that Plaintiff was recognized as a good employee, that she was meeting expectations every year, and that she was improving where necessary when counseled, yet, was fired after only one problematic phone call amongst what must have been thousands of calls during her entire tenure with Chase. Therefore, there is sufficient circumstantial evidence to raise an inference of retaliation.  As Plaintiff has met her burden to establish her prima facie claim, the burden now shifts to Chase to articulate a legitimate, non-discriminatory reason for Plaintiff's termination.

**2.      Legitimate Non-Discriminatory Reason for Adverse Employment Action**

If the plaintiff is successful in establishing a prima facie case, an inference of discrimination arises and the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.  McDonnell Douglas, 411 U.S. at 802-03.  If the employer articulates such a reason, the presumption of discrimination drops away.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142-43 (2000).  The plaintiff must then prove by a preponderance of the evidence that the reason offered was pretextual.  See Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).  The plaintiff has the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against him.  Id.

21

The record shows that Plaintiff was fired on August 31, 2007, for "refusing to assist a customer" on August 29, 2007. (Thompson Dep. 303; Exs. 37, 40, doc. # 18-5.)  Although Plaintiff disputes that she "refused to assist" the customer, claiming that she must not have been able to hear him, she concedes that refusing to respond to a customer would constitute inappropriate customer service. (Thompson Dep. 315-16, 328.)  She further concedes that telling a customer that it is "his choice" to take his business elsewhere is inappropriate and that she could have been more empathetic on the call. (Thompson Dep. 313-15.)  Plaintiff also admits that there may have been a couple times during the call where she was trying to talk over the customer and that talking over a customer is inappropriate. (Id. 311.)  It is also undisputed that for at least thirty seconds,[7] the customer asked Plaintiff what she was going to do about his problem and then proceeded to ask if she was still on the line, since he had not received any response, before eventually hanging up. (Trans. of Phone Call, Ex. 37, doc. # 18-5; Recording of Phone Call, Ex. 47; Thompson Dep. 309, 315.)  Furthermore, there is no dispute that Plaintiff took twelve phone calls after this one, never reported or remembers having a headset malfunction on that day, and never made a notation that this customer hung up on her or that she experienced some kind of system error. (Exs. 38-39, doc. # 18-5; Thompson Dep. 316-19, 325, 328.)  Thus, Plaintiff's supervisors concluded, after hearing the call, that Plaintiff had intentionally refused to respond to the customer and had otherwise provided poor

---

[7]There is a discrepancy regarding how long the customer stayed on the line asking Plaintiff questions between the recording of the phone call (ex. 47, filed manually) and the transcript of the call (ex. 37, doc. # 18-5).  The transcript shows that the customer remained on the line, asking questions without response for over a minute.  The actual recording filed with this Court, however, records the customer on the line for approximately thirty seconds asking questions without response before the recording ends. The time difference is not relevant to the Court's analysis, however, because Chase determined from the non-response, after listening to the call, that Plaintiff had intentionally refused to respond to the customer.

customer service during the call, warranting her discharge. (Weatherwax Dep. 42-43, 45-46, 48-49; Kaskocsak Dep. 40, 42-43; Recommendation for Termination, Ex. 40, doc. # 18-5.)  This non-discriminatory reason is well-supported by the record, especially when considering that Plaintiff's position was a "customer service" position, she had been counseled on the quality of her calls in the months preceding her termination, and Chase granted every FMLA request Plaintiff made without criticism or discipline. See Skrjanc, 272 F.3d at 315.

The Court therefore finds that Defendant has met its burden to articulate a legitimate non-discriminatory reason for terminating Plaintiff's employment at Chase.  Consequently, the burden shifts back to Plaintiff to show that the proffered reason is pretextual.

### 3.      Pretext

Plaintiff may prove pretext by showing that "a discriminatory reason more likely motivated the employer" or that "the employer's proffered explanation is unworthy of credence."  White v. Baxter Healthcare Corp., 533 F.3d 381, 392 (6th Cir. 2008).  Usually, a plaintiff will demonstrate pretext by showing that: (1) the proffered reason had no basis in fact; (2) the proffered reason was not the actual reason for the employer's decision; or (3) the proffered reason was insufficient to explain the employer's decision.  Id. at 393 (citing Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994)).  As the Court explained in Peters v. Lincoln Electric Co., 285 F.3d 456, 472 (6th Cir. 2002), the first and third types are direct attacks on the employer's credibility. With the second type, the plaintiff argues that the "sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup." Manzer, 29 F.3d at 1084.  Here, Plaintiff appears to rely only upon the third method for proving pretext, that is, that the proffered reason constitutes an insufficient explanation for the

23

action, arguing that other employees, specifically non-FMLA employees, were treated differently even though they engaged in substantially the same conduct. <u>Manzer</u>, 29 F.3d at 1084; <u>Gray v. Toshiba</u>, 263 F.3d 595, 600-02 (6th Cir. 2001).

In that respect, Plaintiff has argued that non-FMLA employees were treated more favorably than her, indicating that Chase's reason for firing her was pretextual. (Pl.'s Mem in Opp'n 10.) Specifically, Plaintiff argues that three other employees, namely, Susan Govelitz, Sarah Conklin, and an unnamed black male, "were provided with written warnings before being terminated when they were accused of providing rude customer service." (<u>Id</u>.) (citing Kaskocsak Dep. 30-32, 37-39; DiRenna Dep. 30-34; Ex. I, doc. # 20-4.)  Plaintiff further maintains that employees are allowed to hear the problem call before termination and Plaintiff was denied this opportunity. (<u>Id</u>.)  Therefore, Plaintiff argues that these facts indicate that Chase had a retaliatory motive in terminating her.

Chase refutes all of Plaintiff's claims and argues that her assertions are inaccurate. (Def.'s Reply 5.) First, Chase argues that two of the three alleged "non-FMLA employees," who were similarly fired for providing poor customer service, took FMLA leave while employed at the Bank. (<u>Id</u>. 6.)  Chase explains that the "unnamed black male" has been identified as Ronald Turner, Sr. through Human Resources records, and DMS's records reveal that Turner took two FMLA leave of absences: 1) from December 17, 2003 through February 1, 2004, and 2) from October 15, 2005 through November 1, 2005. (DiRenna Aff. ¶¶ 3-4, Ex. C to Def.'s Reply, doc. # 24-3; Kaskocsak Dep. 29-30; Ex. I, p. 2, doc. # 20-4.)  Turner was fired in March 2006 for inappropriate customer interactions. (DiRenna Aff. ¶ 4; Ex. I, p. 2, doc. # 20-4.)  Similarly, Susan Govelitz took both continuous and intermittent FMLA leave from May 23, 2006 through December 31, 2006. (DiRenna Aff. ¶ 5.) On July 31, 2007, Govelitz was fired for unprofessional behavior and placing customer

relations in jeopardy. (<u>Id</u>.; Ex. I, p. 5, doc. # 20-4.)

Second, Chase argues that although its records reflect that Sarah Conklin and Ronald Turner had received written warnings on their conduct before they were fired, nothing in the record indicates that Govelitz was likewise issued a written warning before her termination. (Def.'s Reply 6; Ex. I, pp. 2, 5-6, doc. # 20-4.)  In fact, Chase points out that Govelitz's situation was very similar to Plaintiff's: she was verbally counseled both about unprofessional behavior toward customers, and on her unsatisfactory quality scores for the months of May and June 2007, before being terminated in July 2007 for unprofessional behavior towards a customer. (Def.'s Reply 6; Ex. I, p. 5, doc. # 20-4.)  Further,  Chase argues that Plaintiff has failed to present any evidence that the Bank was required to issue a written warning before terminating her.  In fact, Chase's corrective action policy contains no such directive. (Def.'s Reply 6.)  Chase's disciplinary policy sets forth a "corrective action guideline" and lists corrective steps in the following order: coaching and counseling; written warning; restrictions period; immediate termination. (Ex. 1 to DiRenna Aff., doc. # 24-3.) However, the Bank also explains that corrective action may be taken, in the Bank's discretion, "at any time, with or without notice," and that the guidelines may be abbreviated, in Chase's "sole discretion," including "proceeding to immediate termination of employment at any time without any prior warnings." (<u>Id</u>.; Def.'s Reply 6.)  Thus, Chase argues that the fact that Plaintiff did not receive a written warning prior to her termination cannot establish pretext.

Finally, Chase argues that there is no support in the record for Plaintiff's assertion that "employees are allowed to hear the alleged problem call prior to termination." (Def.'s Reply 6.) Chase maintains that listening to the call would not have changed the outcome or decision to terminate Plaintiff because her management team and HR business partner had already concluded

that Plaintiff's conduct warranted immediate termination. (Id. 7) (citing DiRenna Dep. 23; Kaskocsak Dep. 41). Further, Govelitz was also denied the opportunity to hear the call that led to her termination.[8] Thus, for all of the above reasons, Chase maintains that Plaintiff was not treated differently from any similarly situated employees and cannot meet her burden to show pretext. (Id.)

The Court agrees that there is no evidence to support pretext based on Chase's denial of Plaintiff's request to hear the problem call during her termination meeting. However, the Court disagrees that Plaintiff has failed to present sufficient evidence to create a genuine dispute as to whether Chase's proffered reason for terminating her was in fact pretextual. First, although Plaintiff was incorrect that the other three employees were all non-FMLA employees, Plaintiff was correct that they appear to have been treated differently. Both Robert Turner (FMLA employee) and Sarah Conklin (non-FMLA employee) were given written warnings about their conduct before another incident occurred that led to their termination. (Ex. I, pp. 2, 6, doc. # 20-4.) Additionally, both employees' termination records indicate that they were being terminated based on multiple incidents of rude conduct or inappropriate customer service whereas Plaintiff's termination cites one phone call and only generically mentions previous counseling on the quality of her calls. (Id. at pp. 1, 2, 6.)

Second, the circumstances of Govelitz's termination are not as similar to Plaintiff's as Chase argues. Although Govelitz similarly took FMLA leave, was not issued a written warning before her termination, and was not permitted to hear the problem call at her termination meeting, the call that

_____

[8]In her Affidavit, DiRenna explains that she conducted Govelitz's termination meeting. During that meeting, Govelitz asked to hear the call but was informed that listening to it would not change the decision to terminate her. Thereafter, Govelitz was no longer interested in listening to the call. (DiRenna Aff. ¶ 5.)

26

led to Govelitz's termination involved the customer calling back to lodge a formal complaint about Govelitz's unprofessional behavior. (Ex. I, pp. 5, doc. # 20-4.)  Furthermore, Govelitz's termination record revealed that she was counseled both on the day before, as well as the day of, the call that led to her termination about unprofessional behavior towards customers and her unacceptable quality scores for the months of both May and June. (Id.)  Conversely, Plaintiff was counseled on her quality scores in June 2007 and improved for the next three months, even "meeting expectations" on her annual review in August, before being fired on August 31, 2007.  Unlike Plaintiff, Govelitz was counseled two days in a row and then proceeded to take a phone call in the afternoon of the second day of counseling wherein she was aggressive and actually hung up on the customer. (Id.)  Furthermore, and also unlike Plaintiff, Govelitz's last period of FMLA leave ended seven months before she was terminated, while Plaintiff was recently approved for, and continuing to take, further FMLA leave at the time she was fired. (Ex. I, pp. 5, doc. # 20-4; Ex. 1 to DiRenna Aff. ¶ 5, doc. # 24-3.)

Finally, the fact that Chase's corrective action policy gives significant discretion to the Bank to skip steps in the disciplinary process and proceed to immediate termination without warning, does not necessarily support Chase's argument that Plaintiff is unable to prove pretext.  Importantly, Chase's policy gives significant discretion to the manager, as it allows that "immediate termination may occur at any time without any prior coaching or counseling if, in the manager's judgment, the situation calls for such action." (Ex. 1 to DiRenna Aff., doc. # 24-3) (emphasis added).  Here, at the time of Plaintiff's discharge, Plaintiff's manager was aware of her FMLA leave-taking, aware of her attempted improper use of that leave on one recent occasion, and aware of her request for further leave on top of the leave she was already taking to care for her son.  Roughly one month after this

27

most recent request for further FMLA leave, Plaintiff was fired on the basis of <u>one</u> phone call. Plaintiff had never been issued a written warning and in her manager's discretion, that one phone call was brought to the attention of Kaskocsak and Clark and ultimately served as the basis for her immediate termination. Even aside from the fact that the other employees cited by Plaintiff had multiple occurrences of misconduct, written warnings, or counseling immediately preceding the conduct that got them fired, the amount of subjective discretion given to Plaintiff's manager, as outlined in Chase's disciplinary policy, makes such an employment decision "easily susceptible to manipulation in order to mask . . . the true reasons for making the [employment] decision." <u>White v. Baxter Healthcare Corp.</u>, 533 F.3d 381, 394 (6th Cir. 2008) (finding a genuine issue of material fact as to pretext where defendant's hiring decision was based on an "inherently subjective" evaluation of plaintiff's interview performance "and thus easily susceptible to manipulation in order to mask the interviewer's true reasons for making the promotion decision.") In this case, the Court finds that Plaintiff has provided sufficient evidence from which a reasonable jury could determine that the proffered reason for her termination was pretextual, and summary judgment is therefore inappropriate.

Thus, for all of the above reasons, Chase's motion for summary judgment on Plaintiff's FMLA retaliation claim is denied.

**B.** **Discrimination on the Basis of Disability in violation of the ADA and Ohio Law**

Plaintiff's second claim in the Complaint alleges that Chase's conduct in terminating her amounts to disability discrimination or retaliatory conduct in violation of the ADA, 42 U.S.C. § 12101, *et seq.* (2006), and Ohio law, Ohio Rev. Code § 4112. Under the ADA and Ohio law,

28

employers may not discriminate against an individual on the basis of her disability in regard to the terms and conditions of employment, including hiring or discharge, among other things. 42 U.S.C. § 12112(a) (2006); Ohio Rev. Code § 4112. Ohio law in this area was modeled after federal law and therefore, the essential elements for disability discrimination under the ADA and the Ohio Revised Code are the same. City of Columbus Civil Serv. Comm'n v. McGlone, 697 N.E.2d 204, 206-07 (Ohio 1998); Pfanz v. Cincinnati, 778 N.E.2d 1073, 1080 (Ohio Ct. App. 2002); Hoffman v. Fidelity Brokerage Servs., Inc., 959 F. Supp. 452, 457 n.1 (S.D. Ohio 1997). Consequently, Ohio courts often look to federal case law and regulations for guidance and interpretation of Ohio law. Id. Thus, federal law regarding ADA claims can apply equally to Ohio disability discrimination claims. See id. Therefore, the Court will address both the federal and state claims for disability discrimination together.

In order to establish a prima facie case of disability discrimination, an ADA plaintiff must prove that: (1) she is disabled under the statute; (2) she is qualified to perform the essential job requirements, with or without reasonable accommodation; and (3) she suffered an adverse employment action solely by reason of her disability[9]. McKay v. Toyota Motor Mfg., U.S.A., Inc., 110 F.3d 369, 371 (6th Cir.1997) (emphasis added); McGlone, 697 N.E.2d at 206. As part of Plaintiff's prima facie case, she must be able to establish that she was a "'qualified individual with a disability' at the time of the discriminatory act." Kocsis v. Multi-Care Management, Inc., 97 F.3d 876, 884 (6th Cir. 1996) (emphasis in original). Defendant argues that Plaintiff cannot meet her

---

[9]The standard under Ohio law differs here, as a plaintiff need only show that the defendant took an adverse employment action against her, at least in part, because of her disability. McGlone, 697 N.E.2d at 206 (emphasis added). Regardless of this difference however, the Court's evaluation under either standard must begin with whether Plainitff was legally disabled.

prima facie burden because she is not disabled, was never perceived as disabled, and she was not terminated because of her medical condition. The Court begins with the threshold question of whether Plaintiff is legally disabled.

To be "disabled" under the ADA or Ohio law, Plaintiff must have a physical or mental impairment that 1) substantially limits one or more major life activities; 2) a record of such impairment; or 3) be regarded as having such an impairment. Ohio Rev. Code § 4112.01(A)(13); DiCarlo v. Potter, 358 F.3d 408, 418 (6th Cir. 2004); Pfanz v. Cincinnati, 778 N.E.2d 1073, 1080 (Ohio Ct. App. 2002). To be "substantially limited" means that that the Plaintiff is "[u]nable to perform a major life activity that the average person in the general population can perform," or that she is "[s]ignificantly restricted" in the manner and conditions under which she can perform a major life activity when compared to an average person in the general population. 29 C.F.R. § 1630.2(j)(1). A "major life activity" includes "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." Id. § 1630.2(i).[10] The parties dispute the first and third prong, that is, whether Plaintiff is limited in any "major life activities" and whether Chase regarded her as having a disability. Plaintiff does not argue that she had a "record of such impairment," under the second prong listed above, and therefore, the Court will not address it.

### 1. Substantially Limited in a Major Life Activity

Chase argues that although Plaintiff suffers from an impairment, Graves' disease, she is not

---

[10]The Court notes that the ADA Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553, which became effective January 1, 2009, made some major changes to the ADA and rejected prior Supreme Court precedent, and portions of the EEOC's regulations, defining the above-mentioned requirements. See Pub.L. No. 110-325, § 2, 4, 122 Stat. 3553, 3554-55. However, the changes are not relevant to Plaintiff's claim because the Amendments Act does not apply retroactively. Millholland v. Sumner County Bd. Of Educ., 569 F.3d 562, 565-67 (6th Cir. 2008).

limited in any major life activity. (Thompson Dep. 132-35, 144; Def.'s Mot. Summ. J. 21.)  In fact, Chase maintains that Plaintiff admitted at her deposition that she is not handicapped, and has never considered herself to be handicapped. (Thompson Dep. 64-66.)  After her termination, Plaintiff applied for unemployment compensation with the Ohio Department of Job and Family Services and indicated that she was able to work without restriction. (Id. 70-71; Ex. 3, doc. # 18-2.)  Chase asserts that Plaintiff has "never restricted her job search because of her medical condition" and has maintained full-time employment since August 2008 selling furniture at Ashley Furniture Home Store, where she interacts with customers. (Def.'s Mot. Summ. J. 22; Thompson Dep. 70-71, 74-75, 116.)  Additionally, Defendant argues that Plaintiff concedes that her Graves' disease is controlled through medication and that it has never interfered with her ability to work. (Thompson Dep. 135, 139, 146-47.)  At the time that she was fired, her Graves' disease was in remission. (Id. 143.)  Thus, in light of these facts and Plaintiff's concessions, Chase argues that it is "impossible" for Plaintiff to show that she is disabled under this definition. (Def.'s Mot. Summ. J. 22.)

Plaintiff responds that her Graves' disease does impair her ability to sleep and work. (Thompson Dep. 137, 139; Ex. 2 to Pl.'s Mem. in Opp'n, doc. # 23-2.)  She further argues that two federal courts have recognized Graves' disease as an impairment. (Pl.'s Mem. in Opp'n 11) (citing Harris v. H&W Contracting Co., 102 F.3d 516, 520 (11th Cir. 1996); Edwards v. Ford Motor Co., 218 F. Supp. 2d 846, 848 (W.D. Ky. 2002)).  Plaintiff further asserts that the court in Edwards found that the plaintiff's Graves' disease "affected her major activities of sleeping and caring for herself," and Plaintiff argues that she is similarly impaired.[11] (Pl.'s Mem. in Opp'n 11.)  Plaintiff also now

_____

[11]However, Plaintiff misstates the holding in this case. The district court in Edwards was discussing the procedural history of the case wherein the court had previously found that the plaintiff was disabled under the statute, for the reasons recounted by Plaintiff here, but later

31

argues that she was mentally impaired by depression while working at Chase, as she was diagnosed with major depressive disorder and she was approved for short term disability leave based on this condition. (Id. 11-12.; Thompson Dep. 156-58; Ex. 2 to Pl.'s Mem. in Opp'n.)

Chase replies that the fact that Plaintiff has admitted, at deposition, that she is not disabled, and has never considered herself disabled should be dispositive on this issue. (Def.'s Mot. Summ. J. 7.)  Furthermore, Chase argues that Plaintiff cannot meet her prima facie burden by merely citing two federal cases that held that Graves' disease was an "impairment." (Id.)  Rather, Plaintiff must show that *she* has an impairment which substantially limits *her* in a major life activity. (Id. 8.) Additionally, Chase argues that the record refutes Plaintiff's claims that she was disabled by depression, as there is no evidence that Plaintiff was still suffering from depression when she was terminated in 2007. (Thompson Dep. 225-26, 228-33, 235, 258-60.)

It is well settled that not every impairment will qualify as a "disability" under the ADA. See e.g., Daugherty, 544 F.3d at 703.  A plaintiff in a disability discrimination case must provide individualized evidence tending to show that she is substantially limited in a major life activity by her impairment. Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 196, 198 (2002) (superseded by Amendments Act of 2008, Pub.L. No. 110-325, 122 Stat. 3553 (2008));[12] 29 C.F.R. pt. 1630, App. § 1630.2(j).  "With respect to the major life activity of working– (i) The term substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable

---

reversed its finding when ruling on the defendant's motion to reconsider. Edwards, 218 F. Supp. 2d at 848-49. Thus, this case provides no support for Plaintiff's position.

[12]The amendments to the ADA are not relevant to Plaintiff's claim as they do not apply retroactively. See fn. 8.

training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i).  The ameliorative effects of medication to treat an impairment must be taken into account when determining whether a limitation is substantial. Sutton v. United Air Lines, 527 U.S. 471, 482 (1999) (superseded and now expressly rejected by Amendments Act of 2008, Pub.L. No. 110-325, §§ 2(b)(2), 3(4)(E)(i), 122 Stat. 3553, 3554, 3556 (2008)).  In this case, Plaintiff has not supported her claim that she was substantially limited in a major life activity beyond summarily arguing that "her Graves' disease and thyroid condition substantially impairs his [*sic*] ability to do sleep and work." (Pl.'s Mem. in Opp'n 11) (citing Thompson Dep. 137, 139; Ex. 2 to Pl.'s Mem. in Opp'n).

With respect to the major life activity of working, Plaintiff does not present any evidence of significant restriction in her ability to perform a class or broad range of jobs when compared to the average person and instead, essentially concedes that her Graves' diseases does not substantially limit her ability to work.  Explaining the impact of Graves' disease, Plaintiff has only stated that she has "good days and bad days," with bad days characterized as days when her heart palpitates, her mind races, and her eyes twitch. (Thompson Dep. 137.)  When the symptoms are bad, Plaintiff has testified that she feels anxious, but admits that she has always reported to work in spite of any symptoms and cannot recall ever calling off work because of the symptoms of Graves' disease since her diagnosis in 2006. (Id. 135, 138-39.)  Plaintiff further admits that her condition is controlled with medication. (Id.135.)  Additionally, she was in remission at the time she was fired from Chase. (Id. 143.)  Furthermore, in her application for unemployment benefits following her termination, Plaintiff indicated that she was not handicapped and that she was looking for work without restriction.  (Exs. 2-3, doc. # 18-2; Thompson Dep. 65-66, 70-71.) She also explained during her deposition that she has never considered herself to be handicapped and that she has not restricted  her job search

because of her condition. (Thompson Dep. 65-66, 116.) Since August 2008, Plaintiff has been working full-time, in a customer service position at Ashley Furniture, and concedes that she has never missed work there because of her medical condition. (Id. 74-75, 146-47.) Thus, there is no evidence that Plaintiff was, or currently is, substantially limited in her ability to work due to Graves' disease.

With respect to the effect of Graves' disease on Plaintiff's ability to sleep, Plaintiff has only offered testimony that when she does experience symptoms, they often occur at night making it "very difficult" to sleep. (Id. 137, 162.) However, as explained above, Plaintiff has testified that her medication controls her disease and she has not offered any evidence on how frequently she experiences the symptoms of Graves' disease, such that this Court could infer how often she might have "difficulty" sleeping, nor has she offered any evidence regarding how many hours of sleep she gets when her symptoms flare up. Further, the medical records cited by Plaintiff in support of her argument only indicate that she had problems sleeping in March 2006 while she was on short-term leave following the deaths of her brother and godmother. At that time, she reported getting 3-4 hours of sleep per night and was prescribed a sleep aid. (Ex. 2 to Pl.'s Mem. in Opp'n.) There is no evidence of her sleeping pattern thereafter or how many hours of sleep she routinely gets each evening. A single documented one or two month span of difficulty in sleeping in 2006, along with a current claim that it is sometimes "very difficult" to sleep when experiencing symptoms, is not enough to raise a genuine issue of material fact regarding whether Plaintiff is "substantially limited" in her ability to sleep when compared to the average person. See Swanson v. Univ. of Cincinnati, 268 F.3d 307, 316 (6th Cir. 2001) (holding that plaintiff was not substantially limited in ability to sleep, where sleep improved through medication, and less than 5 hours of sleep per night did not

34

represent a significant restriction compared to the average person); 29 C.F.R. § 1630.2(j)(2) ( in assessing whether "an individual is substantially limited in a major life activity," factors should be considered, including the severity of the impairment, expected duration, and permanent or long-term impact of the impairment.).

Furthermore, with respect to Plaintiff's claim that she is mentally impaired by depression, Plaintiff likewise fails to make a sufficient showing that she is disabled by depression under the statute.  In order to establish a claim under the ADA, the plaintiff must show that she is a "'qualified individual with a disability' *at the time of the discriminatory act*." Kocsis, 97 F.3d at 884 (emphasis in original).  Not only has Plaintiff failed to argue that her depression substantially limited her in a major life activity, but furthermore, she has not presented any evidence that she was suffering from depression at the time she was fired.  Instead, Plaintiff's referenced medical records only show that she received counseling for depression in March and April of 2006, that she had trouble sleeping during that time, and that she made progress by the end of April 2006 and was ready to work again, although she no longer wanted customer contact. (Ex. 2 to Pl.'s Mem. in Opp'n.)  It is undisputed that Plaintiff was on short-term disability leave during this period of time, after the deaths of two close family members, and returned to work thereafter, maintaining acceptable reviews and performing her job functions without incident.  Plaintiff has not provided any evidence of continuing depression or of how that depression affected a major life activity beyond that period of short-term leave.  Thus, there is no evidence from which this Court can conclude that Plaintiff was or is disabled by depression under the ADA or Ohio law.

### 2. Regarded as Having a Physical or Mental Impairment

A plaintiff pursuing a claim under the ADA or Ohio law may also establish that she is legally

35

disabled if her employer mistakenly regarded her as being disabled within the meaning of the ADA. See e.g., Ross v. Campbell Soup Co., 237 F.3d 701, 706, 709 (6th Cir. 2001); Sutton, 527 U.S. at 489.  The Supreme Court has explained that to meet the "regarded as" prong, a plaintiff must either show that (1) the employer mistakenly believed that that plaintiff had an impairment that substantially limited her in one or more major life activities, or (2) that the employer mistakenly believed that an actual, nonlimiting impairment substantially limited the plaintiff in one or more major life activities.  Id.  "In both cases, it is necessary that a covered entity entertain misperceptions about the individual-it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting."  Id.[13]

In this case, Chase argues that it is entitled to summary judgment because there is no evidence that anyone at the Bank ever regarded Plaintiff as disabled under the Act. (Def.'s Mot. Summ. J. 22.)  Chase argues that Plaintiff admits that no one at the Bank ever told her that her medical condition interfered with her ability to perform the duties of her job or ever told her that they  thought she was disabled by her medical impairment. (Id.) (citing Thompson Dep. 261-62, 329.)

Plaintiff responds that she can establish her prima facie case by showing that her employer perceived that there was no job, within a class of work, which she could perform. (Pl.'s Mem. in Opp'n 12) (citing Henderson v. Ardco, Inc., 247 F.3d 645, 654 (6th Cir. 2001); Moorer v. Baptist

_____

[13]The Court once again notes that although the 2008 Amendments to the ADA do not apply to the present matter, the Amendments reject Sutton's approach here and in fact redefine the requirements of the "regarded as" prong. Pub. L. No. 110-325, §§ 2(b)(3), 4(a)(3)(A), 122 Stat. 3553, 3554-55.

Mem'l Health Care Sys., 398 F.3d 469, 483-84 (6th Cir. 2005)).  Plaintiff asserts that Defendant "[c]learly . . . perceived that there was no job available for Plaintiff that required less stressful phone interaction with customers." (Id.) (citing Weatherwax Dep. 18-19). Plaintiff argues that she suffered an adverse employment actions as a result, when she was not allowed to change positions and also when she was ultimately fired. (Pl.'s Mem. in Opp'n 13.)

Defendant replies that the case law cited by Plaintiff explains that the employer must believe that there are no jobs that the employee can perform; in this case, Chase never even believed that Plaintiff was incapable of performing her job as a senior chargeback advisor, let alone did Chase perceive that she was unable to do any job. (Def.'s Reply 9-10.)  Instead, Chase maintains that it was Plaintiff who believed she needed to move to a different position without customer contact because she thought that would be less stressful for her. (Id.) (citing Thompson Dep. 232-33, 236-37).  Chase argues that there is no evidence that it regarded Plaintiff as disabled.

The Court agrees with Defendant and finds that there is no evidence that Chase, or any of its employees, ever regarded Plaintiff as disabled.  Plaintiff has not argued, or presented any evidence, that anyone at Chase misperceived Plaintiff's ability to perform her job or a broad class of jobs.  Instead, the evidence in the record establishes that Plaintiff wished to transfer to a position without customer contact following her return from short-term leave in April 2006, because she and her doctors felt that her current position as a senior chargeback advisor was too stressful. (Thompson Dep. 232-34, 236-38; Weatherwax Dep. 18-19.)  Unfortunately, when Plaintiff inquired as to whether there were any positions without customer contact, she was informed that there were no jobs at Chase that did not involve customer interaction besides janitorial work. (Thompson Dep. 237-38; Weatherwax Dep. 19.)  Thus, it was Plaintiff, not Chase, that thought she should not be

working with customers, and it was because there were no jobs without customer contact that Plaintiff was not simply transferred to a different position.  Therefore, there is no merit to Plaintiff's claim that Defendant regarded her as being disabled.

Thus, because Plaintiff cannot establish that she is disabled under the ADA or Ohio law, the Court need not address the other elements of Plaintiff's disability discrimination claim.  Defendant, therefore, is entitled to judgment as a matter of law.

## IV.    Conclusion

For all of the foregoing reasons, the Court **GRANTS** Defendant's motion for summary judgment on Plaintiff's race and disability discrimination claims (Counts II and III of the Complaint), but **DENIES** Defendant's motion with respect to Plaintiff's FMLA retaliation claim (Count I). (Doc. # 16.)

**IT IS SO ORDERED.**

Date: August 23, 2010                                **/s/ John D. Holschuh**
                                                     John D. Holschuh, Judge
                                                     United States District Court